IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DON DAVID PRICE, MARIA NYIRADI, and PETER WAHLER, Derivatively on Behalf of BORGWARNER INC., | Case No. |
| Plaintiffs, | |
| v. | |
| ALEXIS P. MICHAS, DENNIS C. CUNEO, MICHAEL S. HANLEY, JOSEPH F. FADOOL, BRADY D. ERICSON, and FREDERIC B. LISSALDE, | |
| Defendants, | |
| -and- | |
| BORGWARNER INC., a Delaware Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
FOR VIOLATION OF SECURITIES LAW AND BREACH
OF FIDUCIARY DUTY**

Plaintiffs, by their attorneys, submit this Verified Stockholder Derivative Complaint for Violation of Securities Law and Breach of Fiduciary Duty. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of plaintiffs' counsel, which included,

- 1 -

among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and news reports, press releases, and other publicly available sources, and their review of books and records produced by BorgWarner Inc. ("BorgWarner" or the "Company") in response to their individual demands to inspect certain documents pursuant to 8 *Del. C.* §220.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant BorgWarner against certain of its officers and directors for violations of securities law, breach of fiduciary duty, and other violations of law. These wrongs resulted in damages to BorgWarner's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed BorgWarner to potential liability for violations of state and federal law.

2.      BorgWarner is an automotive parts manufacturer.   Its products are designed for improved vehicle performance, propulsion efficiency, stability, and air quality.   Until the 1980s, BorgWarner manufactured brake pads and clutches that contained asbestos.   Asbestos is well recognized as a health hazard, and is directly tied to several life-threatening diseases, including cancer.   Its use is now heavily regulated.

3.      As a result of its use of asbestos, for the past twenty years, BorgWarner has been named as a defendant in, and has developed a familiarity with, asbestos-

related litigation.  For example, in its 2014 Annual Report, the Company stated that "[a]s of December 31, 2014 and 2013, the Company had approximately 13,300 and 17,000 pending asbestos-related product liability claims, respectively."  As a result of these litigations, BorgWarner faced significant liability.

4.      BorgWarner's accounting for and reporting of its liabilities are subject to U.S. Generally Accepted Accounting Principles ("GAAP").   Under GAAP, publicly traded corporations are required to record an accrual of certain contingent liabilities in their financial statements.  Accounting Standards Codification[1] Topic 450-20 ("ASC 450-20") addresses the accrual of loss contingencies.[2]  ASC 450-20 requires entities with probable loss contingencies to record an accrual when the loss is both probable and can be reasonably estimated.  These include estimates of claims both asserted but not yet resolved and those not yet asserted.  Even if the amount is not reasonably estimable, the company still must disclose the nature of the possible loss and give an estimate of the possible loss or range of loss.

5.      Thus, BorgWarner had an obligation to accrue or disclose estimates of the costs of asbestos-related litigation in its filings with the SEC.  The Individual

---

[1] The SEC has delegated its authority to promulgate GAAP for public companies to the Financial Accounting Standards Board ("FASB").  The FASB's standards are generally contained within the FASB Accounting Standards Codification ("ASC").

[2] A loss contingency, or a contingent liability, is a charge to expense for what is considered to be a probable future event, such as an adverse outcome of a lawsuit.

Defendants, as defined herein, failed to do so.

6.    The Individual Defendants, including BorgWarner's Board of Directors (the "Board"), knew or were aware of historical data showing that BorgWarner's asbestos liabilities, including unasserted possible claims, were both probable (*i.e.*, not zero) and reasonably estimable.

7.    Instead of reporting the estimated costs of asbestos-related liability as required, the Company repeatedly claimed in its financial statements that it "cannot reasonably estimate" these costs in excess of amounts already accrued.  It based this reasoning on a number of factors, including the "volatility of asbestos-related litigation in the United States," the "uncertainty of future disease incidence and claiming patterns against the Company," "the impact of tort reform legislation," and "the new discovery of facts; changes in litigation," among other things.  This broad reasoning, however, falls short of GAAP's codified standards.  Indeed, ASC 450-20 states that accrual of a probable loss should not be delayed until only a single amount can be reasonably estimated.  To the contrary, when a loss is probable and a reasonable estimate of the loss is a range, an amount should be accrued for the loss.

8.    Remarkably, despite its long familiarity with asbestos-related litigation, the Company did not hire a third-party consultant to assess its asbestos-related liabilities until the third quarter of 2016.  As can be reasonably expected, after its

review, the third-party consultant projected a potential number of future claims based on the Company's historical claims filings and patterns.

9.      On February 9, 2017, BorgWarner filed its 2016 Annual Report with the SEC.  The Company announced that, due to "enhancements to the management and analysis of asbestos-related claims," it was now able to estimate: (i) the value of its aggregate liability for asbestos-related claims asserted; and (ii) potential asbestos-related claims not yet asserted.  This claim, however, was misleading and hid the true facts about how BorgWarner was able to change its position on asbestos-related claims.  Rather than undergoing "enhancements," the Company simply hired a third-party consultant, something it was always able to do, to conduct the estimate.

10.     The Company claimed that the reasonable estimate for these combined figures was $879.3 million, a significant increase of $770 million from the prior year.  BorgWarner then recorded a pretax asbestos-related net charge of $703.6 million for the 2016 fiscal year.

11.     The SEC took notice of the Company's charge.  Shortly after the February 2017 announcement, in May 2017, the SEC contacted the Company concerning its accounting practices with respect to asbestos-related liabilities.  In its initial letter sent on May 11, 2017, the SEC noted the Company's recent disclosures and asked BorgWarner to "tell us your consideration of accounting for this as a correction of an error in previously issued financial statements rather than as a

change in estimate."  The SEC continued to seek clarification from the Company about its February 2017 disclosures throughout the rest of the year, including asking "why [BorgWarner] did not retain a third-party consultant prior to third quarter of 2016," and why the Company now used historical data when such data was previously considered unreliable.  The SEC concluded that the Company should have recorded its asbestos-related liability prior to its February 2017 disclosures.

12.    On June 15, 2018, when BorgWarner filed a Current Report with the SEC announcing it had inaccurately reported the estimated value of asbestos-related claims that had been incurred but not reported ("IBNR").  As a result, the Company announced it would restate its consolidated financial statements for the 2015 and 2016 fiscal years included in the 2017 Annual Report, and make revisions to selected financial data for 2013, 2014, and its quarterly information for 2016.  The Company also stated it would make additional changes to the valuations of its liability and corresponding available insurance.  In its Asbestos Accounting Update Call with investors and analysts held that same day, BorgWarner's then Chief Financial Officer ("CFO"), Ronald T. Hundzinski ("Hundzinski"), announced that the Company would retroactively determine the appropriate IBNR to be accrued as of December 31, 2012, as an adjustment to retained earnings.  Hundzinski further explained the accrued liability would then be restated, as adjustments, in the Company's

consolidated financial statements for 2012 through 2016 and that the $703.6 million charge in 2016 would be reversed.

13.     On this news, BorgWarner's market capitalization plummeted over the next week, falling $3.73 per share, on June 22, 2018, to close at $45.09 per share compared to a closing of $48.82 per share just six days before.

14.     On July 31, 2018, the SEC informed BorgWarner it was "conducting an investigation related to the Company's historical accounting for asbestos-related claims not yet asserted."  On August 26, 2020, the SEC issued a Cease-and-Desist Order (the "SEC Order") against BorgWarner finding the Company violated the reporting provisions of sections 13(a) and 13(b) of the Securities Exchange Act of 1934 (the "Exchange Act") for its failure to estimate its IBNR liability for future asbestos claims.  As a result, the SEC ordered BorgWarner to cease and desist from committing or causing any violations and future violations and pay a civil penalty of $950,000.

15.     In addition to the significant market capitalization loss, settlement costs, and costs incurred from complying with the SEC investigation into the misconduct, the Company has been harmed as a result of the Director Defendants' (as defined herein) actions in causing the Company to repurchase over $113 million in shares of BorgWarner stock at artificially inflated prices while concealing from

the public that BorgWarner's financial results were inflated by the massively understated environmental liability accruals.

## JURISDICTION AND VENUE

16.    Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violation of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

17.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) BorgWarner is headquartered in this District; and (ii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

19.    Plaintiff Don David Price was a stockholder of BorgWarner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current BorgWarner stockholder.

20.    Plaintiff Maria Nyiradi was a stockholder of BorgWarner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current BorgWarner stockholder.

21.    Plaintiff Peter Wahler was a stockholder of BorgWarner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current BorgWarner stockholder.

**Nominal Defendant**

22.    Nominal defendant BorgWarner is a Delaware corporation with principal executive offices located at 3850 Hamlin Road, Auburn Hills, Michigan. BorgWarner creates technology solutions for combustion, hybrid, and electric vehicles, with a focus on vehicle performance, propulsion efficiency, stability, and air quality.  The Company's products are primarily sold to original equipment manufacturers ("OEMs") of light vehicles worldwide.  As of December 31, 2019, BorgWarner had approximately 29,000 employees.

**Defendants**

23.    Defendant Alexis P. Michas ("Michas") is BorgWarner's Non-Executive Chairman of the Board and has been since April 2013 and director and has been since 1993.  Defendant Michas was also BorgWarner's Lead Director from January 2010 to April 2013.  Defendant Michas knowingly, in bad faith, or in conscious disregard for his duties caused or allowed BorgWarner to: (i) omit estimates of asbestos-related contingent liability from its filings with the SEC; and (ii) fail to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures.  Defendant Michas also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing BorgWarner to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning BorgWarner's true business health, defendant Michas sold 87,798 shares of BorgWarner stock for $3,955,150 in illicit proceeds. BorgWarner paid defendant Michas the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2018 | $280,900 | $130,000 | $410,900 |
| 2017 | $265,000 | $123,005 | $388,005 |
| 2016 | $265,000 | $123,001 | $388,001 |
| 2015 | $245,000 | $115,003 | $360,003 |

24.    Defendant Dennis C. Cuneo ("Cuneo") is a BorgWarner director and has been since February 2009.  Defendant Cuneo was also a member of

BorgWarner's Audit Committee from March 2011 until at least March 20, 2020. Defendant Cuneo knowingly, in bad faith, or in conscious disregard for his duties caused or allowed BorgWarner to: (i) omit estimates of asbestos-related contingent liability from its filings with the SEC; and (ii) fail to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures. Defendant Cuneo also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing BorgWarner to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. While in possession of material, nonpublic information concerning BorgWarner's true business health, defendant Cuneo sold 5,500 shares of BorgWarner stock for $228,010 in illicit proceeds.   BorgWarner paid defendant Cuneo the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2018 | $106,500 | $130,000 | $236,500 |
| 2017 | $108,500 | $123,005 | $231,505 |
| 2016 | $99,500 | $123,001 | $222,501 |
| 2015 | $98,000 | $115,003 | $213,003 |

25.     Defendant Michael S. Hanley ("Hanley") is a BorgWarner director and has been since November 2016.   Defendant Hanley is also Chairman of BorgWarner's Audit Committee and has been since at least March 2018, and a member of that committee and has been since November 2016.  Defendant Hanley knowingly, in bad faith, or in conscious disregard for his duties caused or allowed

BorgWarner to: (i) omit estimates of asbestos-related contingent liability from its filings with the SEC; and (ii) fail to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures. Defendant Hanley also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing BorgWarner to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. BorgWarner paid defendant Hanley the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2018 | $126,500 | $130,000 | $256,500 |
| 2017 | $115,167 | $123,005 | $238,172 |
| 2016 | $16,583 | - | $16,583 |

26.     Defendant Joseph F. Fadool ("Fadool") is BorgWarner's Vice President and has been since May 2012; President and General Manager of BorgWarner Emissions Systems LLC and BorgWarner Thermal Systems Inc. and has been since October 2019; and President and General Manager of Turbo Systems LLC from May 2019 to October 2019. Defendant Fadool was also President and General Manager of BorgWarner Emissions Systems LLC and BorgWarner Thermal Systems Inc. from January 2017 to May 2019. Defendant Fadool was also President and General Manager of BorgWarner Ithaca LLC d/b/a BorgWarner Morse Systems from July 2015 until December 2016. Defendant Fadool was also BorgWarner TorqTransfer Systems' President from June 2011 to May 2012; General Manager from July 2010 to May 2012; and Vice President from July 2010 to June 2011. While in possession

of material, nonpublic information concerning BorgWarner's true business health, defendant Fadool sold 4,000 shares of BorgWarner stock for $191,140 in illicit proceeds.  BorgWarner paid defendant <u>Fadool</u> the following compensation as an executive:

| Year[3] | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $508,750 | $1,170,364 | $656,851 | $639,641 | $2,975,606 |
| 2015 | $416,250 | $1,950,001 | $620,806 | $558,268 | $3,545,325 |

27.    Defendant Brady D. Ericson ("Ericson") is BorgWarner's Vice President and has been since March 2022, and also President and General Manager of BorgWarner Ithaca LLC (d/b/a BorgWarner Morse Systems) from June 2019 to February 2022.  Defendant Ericson was also BorgWarner's Executive Vice President and Chief Strategy Officer from January 2017 to June 2019, and Vice President from March 2014 to December 2016.  Defendant Ericson was also President and General Manager of BorgWarner Emissions Systems LLC from March 2014 until December 2016.  While in possession of material, nonpublic information concerning BorgWarner's true business health, defendant Ericson sold 60,454 shares of

---

[3] Defendant Fadool's compensation for years 2016-2017 does not appear to be publicly available.

BorgWarner stock for $1,231,870 in illicit proceeds.  BorgWarner paid defendant Ericson the following compensation as an executive:

| Year[4] | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2015 | $415,000 | $1,950,001 | $620,806 | $169,539 | $3,155,346 |

28.    Defendant Frederic B. Lissalde ("Lissalde") is BorgWarner's Chief Executive Officer ("CEO") and President and has been since August 2018.  Defendant Lissalde was also Executive Vice President and Chief Operating Officer of the Company from January 2018 to July 2018, and was Vice President of the Company and President and General Manager of BorgWarner Turbo Systems LLC from May 2013 to December 2017.  While in possession of material, nonpublic information concerning BorgWarner's true business health, defendant Lissalde sold 36,720 shares of BorgWarner stock for $1,609,360 in illicit proceeds.  BorgWarner paid defendant Lissalde the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $946,235 | $2,490,633 | $944,146 | $627,428 | $5,008,442 |
| 2017 | $673,173 | $1,407,454 | $1,062,889 | $271,283 | $3,414,799 |
| 2016 | $606,630 | $1,531,424 | $1,041,544 | $277,361 | $3,456,959 |
| 2015 | $577,369 | $2,643,784 | $978,856 | $400,923 | $4,600,932 |
| 2014 | $657,188 | $1,174,725 | $1,131,350 | $410,293 | $3,373,556 |

---

[4] Defendant Ericson's compensation for years 2016-2018 does not appear to be publicly available.

| 2013 | $594,840 | $865,000 | $900,357 | $304,891 | $2,665,088 |

29.    The defendants identified in ¶¶26-28 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶23-25 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶24-25 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶23-24, 26-28 are referred to herein as the "Selling Defendants."  Collectively, the defendants identified in ¶¶23-28 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

30.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe BorgWarner and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage BorgWarner in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of BorgWarner and not in furtherance of their personal interest or benefit.

31.    To discharge their duties, the officers and directors of BorgWarner were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue

of such duties, the officers and directors of BorgWarner were required to, among other things:

(a)     properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how BorgWarner conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Under the Company's Policies**

32.    The Individual Defendants, as officers and directors of BorgWarner, were bound by the Company's Code of Ethical Conduct and Code of Ethics for CEO and Senior Financial Officers (collectively, the "Code").  The Code sets out basic principles to guide all directors, officers, and employees of BorgWarner, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior. This includes that "[f]inancial statements published by BorgWarner must accurately reflect the Company's financial position."  In particular, the Code provides:

**COMPLIANCE WITH LAWS**

BorgWarner's[] overriding policy is to conduct all of its business and operations in complete compliance with all applicable laws and regulations. Employees and directors of the Company are expected to uphold this policy in every aspect of our work for the Company. Compliance with laws is the beginning point of the ethical conduct outlined in this Code. If a law conflicts with a policy, you must comply with the law and notify the Compliance Office of the perceived conflict.

*    *    *

**ACCOUNTING STANDARDS**

All Company funds and assets must be properly disclosed or accounted for in the regular books and records of BorgWarner. Financial statements published by BorgWarner must accurately reflect the Company's financial position. Improper or fraudulent accounting, documentation, and reporting are prohibited, violate Company policy, and may also violate applicable laws. All internal records that support financial reporting must be prepared accurately, completely, and properly. These records include, but are not limited to, expense reports,

time cards, production and inventory counts, quality reports, sales records, attendance statements, supplier documents, consolidating entries, and disclosure support. If you become aware of false or misleading entries or are asked to make such entries in the books or records of the Company, contact the Compliance Office or Legal Department immediately.

33.     The Officer Defendants were also bound by the Code for the "provisions set forth therein relating to ethical conduct, conflicts of interest and compliance with law."  Further, the Officer Defendants were required to follow additional procedures of compliance:

1. The CEO, CFO, Treasurer and Controller are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO, CFO, Treasurer and Controller promptly to bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings.

2. The CEO, CFO, Treasurer and Controller shall promptly bring to the attention of the Disclosure Committee, the Finance and Audit Committee and the Company's internal and external auditors any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO, CFO, Treasurer and Controller shall promptly bring to the attention of the Chief Legal Officer and the Finance and Audit Committee any information he or she may have concerning (a) any violation of the Company's Code of Ethical Conduct, including any actual or apparent conflicts of interest between personal and

professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls and (b) evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Ethical Conduct or of these additional procedures.

4. The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Ethical Conduct or of these additional procedures by the CEO, CFO, Treasurer and Controller. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Ethical Conduct and to these additional procedures, and may include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and termination of the individual's employment. In determining what action is appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

34.    In addition to the above, the Company maintains an Insider Trading and Confidentiality Policy ("Insider Trading Policy"), which at §3.1 specifically states, in pertinent part:

No Director or Employee shall purchase or sell stock, bonds, options, derivative instruments or other securities of the Company ("BorgWarner Securities"), or direct others to purchase or sell BorgWarner Securities, if the person is in possession of material information that has not been publicly disclosed.

35.     Cautioning that "[m]aterial information" has no precise definition, the Insider Trading Policy nevertheless provides a list of non-exclusive examples, and the all-encompassing descriptor that "'material information' includes any information, positive or negative, that a reasonable person would consider important in determining whether to buy or sell BorgWarner Securities."  The Insider Trading Policy continues:

> Information is publicly disclosed if it is contained in an SEC filing, has been published in the newspapers or other media or has been the subject of a press release and the public has had sufficient time to absorb it.  As a general rule, it would be appropriate to refrain from trading for at least two full trading days after the initial release of information to the public.

**Additional Duties of the Audit Committee Defendants**

36.     Audit Committee Defendants Cuneo and Hanley also owed specific duties to BorgWarner to assist the Board in overseeing the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting, among other things.  In particular, the Audit Committee Charter stated:

> The Committee shall provide assistance to the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, financial reporting and risk management practices of the Company. The Committee shall report regularly to the Board and establish and maintain free and open communication between the directors, the independent accountants, the internal auditors and the management of the Company. The Committee will:

*     *     *

8.     Review and discuss recurring financial statements (including quarterly reports and disclosures made in management's discussion and analysis) to be issued to the shareholders or the public with management and the independent auditor and recommend to the Board the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K.

\*      \*      \*

12.     Report Committee activities to the full Board and annually issue a summary report (including appropriate oversight conclusions) suitable for submission to shareholders.

13.     Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a role in the Company's internal controls.

\*      \*      \*

15.     Obtain and review a report from the independent auditor at least annually regarding (a) the independent auditor's internal quality-control procedures, (b) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues, and (d) all relationships between the independent auditor and the Company. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence, taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

16.     Establish and monitor procedures for the receipt, retention and treatment of complaints received by the Company regarding

accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

17.     Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance policies.

18.     Generally review and discuss with management the Company's risk assessment and risk management policies including cyber security risk management practices.

**Breaches of Duties**

37.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of BorgWarner, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

38.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in an improper accounting scheme and make false and misleading statements to the public, improper practices that caused BorgWarner to incur substantial damage.

39.     The Individual Defendants, because of their positions of control and authority as officers or directors of BorgWarner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from

taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, BorgWarner has expended, and will continue to expend, significant sums of money.

## **FACTUAL BACKGROUND**

40.     BorgWarner is an automotive parts manufacturer.  Its products are designed for improved vehicle performance, propulsion efficiency, stability, and air quality. These products are manufactured and sold worldwide, primarily to OEMs of light vehicles (passenger cars, sport-utility vehicles, vans, and light trucks).  The Company's products are also sold to other OEMs of commercial vehicles (medium-duty trucks, heavy-duty trucks, and buses) and off-highway vehicles (agricultural and construction machinery and marine applications).

41.     Until the 1980s, BorgWarner manufactured brake pads and clutches that contained asbestos.  Asbestos is well recognized as a health hazard, and is directly tied to several life-threatening diseases, including cancer.  Its use is now heavily regulated.  Regarding the dangers asbestos presents, the Centers for Disease Control and Prevention states:

> When handled, asbestos can separate into microscopic-size particles that remain in the air and are easily inhaled. Persons occupationally exposed to asbestos have developed several types of life-threatening diseases, including asbestosis, lung cancer and mesothelioma. Although the use of asbestos and asbestos products has dramatically decreased in recent years, they are still found in many residential and commercial settings and continue to pose a health risk to workers and others.

42.     As a result of its use of asbestos, for the past twenty years, BorgWarner has been a named as a defendant in, and has developed a familiarity with, asbestos-related litigation.   In its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K") filed with the SEC on February 15, 2015, the Company stated that "[a]s of December 31, 2014 and 2013, the Company had approximately 13,300 and 17,000 pending asbestos-related product liability claims, respectively."  As a result of these litigations, BorgWarner faced significant liability.[5]

**GAAP Requirements for Loss Contingencies**

43.     Under SEC rules, financial statements which are not prepared in accordance with GAAP are presumptively misleading or inaccurate.  *See* 17 C.F.R. §210.4-01(a)(1)).  The ASC is the "source of authoritative [GAAP]" published by the FASB.  ASC 450-20 addresses loss contingencies.  A loss contingency is defined as an "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future

---

[5] Prior to October 2019, the Company's wholly owned subsidiary, Morse TEC, held BorgWarner's asbestos and certain other liabilities.  On October 30, 2019, the Company announced it had divested Morse TEC, including its asbestos obligations, to Enstar Group Limited.  As part of the deal, the Company paid $172 million to Morse TEC.

events occur or fail to occur." ASC 450-20-20. Thus, legal claims are loss contingencies. According to the SEC, an ASC 450 assessment should consider all claims both asserted but not yet resolved and claims not yet asserted. ASC 450 contains provisions addressing when the loss contingency must be accrued and, if not accrued, when it must nonetheless be disclosed.

### **When a Loss Contingency Must Be Accrued**

44.     The accrual guidance provides that a contingent loss must be accrued when it is probable a loss has been incurred and the amount of loss can be reasonably estimated. It states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a.  Information available before the financial statements are issued ... indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. ... It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.  The amount of loss can be reasonably estimated.

ASC 450-20-25-2.

45.     An entity should not delay accrual of a loss because of the inability to estimate a single amount. The ability to estimate a loss within a range would indicate some amount of a loss has occurred, and therefore, in accordance with ASC 450-20-25-2(b), the entity must accrue a liability. The entity may use past experience or other information to demonstrate its ability to reasonably estimate the loss. If some

amount within a range of loss appears to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range should be accrued.

### When a Loss Contingency Must Be Disclosed

46.     When no accrual is made, the loss contingency nonetheless must be disclosed "if there is at least a reasonable possibility that a loss ... may have been incurred."  ASC 450-20-50-3.  "Reasonably possible" means that the chance of occurrence is "more than remote but less than likely."  ASC 450-20-20.  In a loss contingency involving an unasserted claim or assessment, even if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment, disclosure is required if: (i) "[i]t is considered probable that a claim will be asserted"; and (ii) "[t]here is a reasonable possibility that the outcome will be unfavorable."  ASC 450-20-50-6.

47.     When disclosure is required, it must include both the "nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."  ASC 450-20-50-4.

### THE COMPANY VIOLATED GAAP BY FAILING TO ACCOUNT FOR ITS ASBESTOS LIABILITIES

48.     BorgWarner faced a material loss from asbestos liabilities and that amount was estimable.   Therefore, under ASC 450-20, BorgWarner had an

obligation to accrue both its asserted and unasserted asbestos-related claims or, at the least, disclose the nature of the asbestos litigation *and* provide estimates of the costs of litigation in its filings with the SEC.  The Individual Defendants, however, failed to do so.

49.     BorgWarner's asbestos-related contingent losses were estimable. According to the SEC, when a loss is probable and information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated.[6]  Here, BorgWarner admitted that both asserted and unasserted asbestos-related losses were probable. BorgWarner also had available information indicating that the amount of loss was within an estimable range of amounts, including data from its historical claim filings.

50.     BorgWarner's Annual Reports from 2012 through 2015 showed its historical asbestos-related claim filings.  In particular, between 2012 and 2015, the Company had approximately 16,000, 17,000, 13,300, and 10,100 pending asbestos-related product liability claims, respectively.  The Company resolved, respectively, 2,400, 1,500, 6,500, and 5,300 of those claims.  This information, and even information prior to 2012, could have been utilized to gather the historical proportion of claims resolved without payment, historical settlement costs for those claims that

---

[6] *See* SEC Letter to BorgWarner (August 23, 2017), https://www.sec.gov/Archives/edgar/data/908255/000000000017029819/filename1.pdf.

result in a payment, and historical defense costs. This data could have then been compared to anticipated levels of unique plaintiff asbestos-related claims asserted in the U.S. tort system against all defendants, and a reasonable estimation of unasserted claim filings could be made. The liabilities could then be estimated by multiplying the pending and projected future claim filings by projected payment rates and average settlement amounts and then adding an estimate for defense costs. Thus, based on its historical data of already-pending asbestos-related claims, BorgWarner's asbestos-related contingent losses were estimable.

51. Therefore, BorgWarner's asbestos-related contingent losses should have been accrued, or at the very least, disclosed. In addition to these loss contingencies being probable, there was a reasonable possibility that their outcome will be unfavorable—requiring disclosure. Indeed, in 2012, of the Company's 16,000 already-pending asbestos-related product liability claims, 2,400 were resolved that year. Thirteen percent of the resolved claims resulted in payment to the claimant or on behalf of BorgWarner. In 2012, the Company paid and accrued $44.9 million in defense and indemnity costs in asbestos-related actions. In 2013, of the 1,500 claims resolved that year, 20% resulted in payment to the claimant or on behalf of BorgWarner. That year, the Company paid and accrued $42.6 million in defense and indemnity costs in asbestos-related actions. In 2014, 6% of 6,500 claims resolved resulted in payment, and the Company paid and accrued $59.4

million in defense and indemnity costs in asbestos-related actions.  In 2015, 7% of 5,300 claims resolved resulted in payment, and the Company paid and accrued $53.9 million in defense and indemnity costs in asbestos-related actions.  These figures do not even consider the unasserted, probable claims facing the Company.  Thus, there existed a reasonable possibility that any unasserted asbestos-related contingent losses would result in an unfavorable outcome.  The Company, therefore, should have disclosed its unasserted asbestos-related liabilities.

**The Individual Defendants Knew About Their Reporting Obligations Under GAAP and the Risks Involved for Failure to Disclose Asbestos-Related Liabilities**

52.    The Board has long known about the Company's need to disclose estimates of the costs of asbestos-related litigation and the potential risks involved for omitting those estimates from its financial statements.  As later admitted, the Individual Defendants knew, or had access to historical data, that BorgWarner's asbestos liabilities were both probable (*i.e.*, not zero) and reasonably estimable.  Yet, they failed to disclose the estimable losses from the asbestos liability.

53.    Between 2013 and 2016, defendant Cuneo served on the Audit Committee and defendant Hanley joined the Audit Committee in 2017.  Thus, defendants Cuneo and Hanley were well aware of the Company's reporting obligations concerning its probable and reasonably estimable unasserted asbestos-related claims.

## THE INDIVIDUAL DEFENDANTS MADE IMPROPER
## STATEMENTS CONCERNING BORGWARNER'S
## ACCOUNTING FOR ASBESTOS-RELATED LIABILITIES

54.     As described herein, the Individual Defendants knew that its asbestos-related liabilities were probable and reasonably estimable.  They also knew that its unasserted asbestos-related liabilities were probable and there was a reasonable possibility that the outcome would be unfavorable.  Instead of reporting the costs of asbestos-related liability as required under the law, the Company disclosed nothing beyond what was accrued, and it only accrued estimates of liabilities for claims already asserted but not yet resolved.

55.     The Individual Defendants instead repeatedly claimed that BorgWarner could not reasonably estimate possible losses in excess of its accruals in SEC filings. For example, in the Company's 2014 Form 10-K, it represented:

> ***The Company's estimate of asbestos-related liabilities is subject to uncertainty because liabilities are influenced by numerous variables that are inherently difficult to predict.***  Key variables include the number and type of new claims, the litigation process from jurisdiction to jurisdiction and from case to case, reforms that may be made by state and federal courts and the passage of state or federal tort reform legislation.  The nature of the historical product being encapsulated and the lifecycle of the product allow the Company to aggressively defend against these lawsuits and, ***at present, management does not believe that asbestos-related product liability claims are likely to have a material adverse effect on the Company's results of operations, financial position or cash flows***.

56.     On October 29, 2015, BorgWarner filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q")

with the SEC.  The Q3 2015 Form 10-Q represented that BorgWarner's financial statements were "prepared in accordance" with GAAP.  The Q3 2015 Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that assured investors that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  The SOX certifications also stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," of BorgWarner.  The Q3 2015 Form 10-Q made representations that BorgWarner cannot "reasonably estimate possible losses in excess of those for which it has accrued."  In particular, the Q3 2015 Form 10-Q stated:

> The Company does not believe that it can, at present, reasonably estimate possible losses in excess of those for which it has accrued. The Company's belief is based on a number of factors, including without limitation, because the Company cannot reasonably predict how many additional claims may be brought against the Company (or parties the Company has an obligation to indemnify) in the future, the particular illnesses or medical conditions that may be alleged in such claims, the allegations in such claims and the evidence submitted by claimants in support thereof, the possible outcomes in settling or litigating such claims, the time in which claims will proceed through courts in which they are asserted, or the impact of tort reform legislation that may be enacted at the state or federal levels. The Company reviews factors relevant to the asbestos claims that have been or may in the future be asserted against it on an ongoing basis.

57.    Based on only reporting BorgWarner's asbestos-related liability in cases already pending against the Company, the Q3 2015 Form 10-Q stated that the estimated value of the Company's asbestos-related claims asserted but not yet resolved for the period ended September 30, 2015 was just $111.9 million.  The Company made no accrual for or disclosure of its unasserted asbestos-related liability.

58.    On February 11, 2016, BorgWarner filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Form 10-K") with the SEC.  Defendants Cuneo and Michas signed the 2015 Form 10-K.  The 2015 Form 10-K made similar representations that "its ultimate liability ... cannot be reasonably estimated at this time in excess of the amount accrued."  It supposedly based this reasoning on a number of factors, including the "volatility of asbestos-related litigation in the United States," the "uncertainty of future disease incidence and claiming patterns against the Company," "the impact of tort reform legislation," and "the new discovery of facts; changes in litigation," among other things.  In particular, the 2015 Form 10-K stated:

> ***The Company believes that its ultimate liability*** (i.e., the total of its indemnity or other claim dispositions plus legal related fees) ***cannot be reasonably estimated at this time in excess of amounts accrued.***  The Company's ability to reasonably estimate its liability has been significantly affected by, among other factors, the volatility of asbestos-related litigation in the United States, the significant number of co-defendants that have filed for bankruptcy, the magnitude and timing of co-defendant bankruptcy trust payments, the inherent uncertainty of

future disease incidence and claiming patterns against the Company, and the impact of tort reform legislation that may be enacted at the state or federal levels. The Company's ability to reasonably estimate its liability for asbestos-related claims may also be affected in the future by the new discovery of facts; changes in litigation; the impact of any possible tort reform; changes in assumptions regarding the number and nature of asbestos-related claims, including the total population claiming exposure; the amounts of any judgments over time; and changes in settlement/defense strategies. The Company reviews factors relevant to asbestos-related claims that have been, or may in the future, be asserted against it on an ongoing basis.

59.     The Company repeated this claim in its Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2016, June 30, 2016, and September 30, 2016, filed with the SEC. During those periods, the Company made no accrual for or disclosure of its unasserted asbestos-related liability.

60.     Based on only reporting BorgWarner's asbestos-related liability in cases already pending against the Company, the 2015 Form 10-K stated that the estimated value of the Company's asbestos-related claims asserted but not yet resolved for the 2015 fiscal year was just $108.5 million. The Company made no accrual for or disclosure of its unasserted asbestos-related liability.

**The Company Finally Hires a Third-Party Consultant to Provide Actuarial Assistance in Connection with Its Accounting for Asbestos-Related Liabilities**

61.     Despite their knowledge of their requirements to account for and disclose probable and reasonably estimable asbestos-related liabilities, the Individual Defendants, remarkably, did not retain a third-party consultant to assess its liabilities prior to the third quarter of 2016.

62.     On February 9, 2017, BorgWarner filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") with the SEC.  Defendants Cuneo, Hanley, and Michas each signed the 2016 Form 10-K.  In the 2016 Form 10-K, the Company announced that, based on the purported "enhancements," it was now able to estimate the value of its aggregate liability for: (i) asbestos-related claims asserted; and (ii) potential asbestos-related claims not yet asserted.

63.     The 2016 Form 10-K explained that the Company was able to develop these estimates through its retention of a third-party consultant, Willis Towers Watson.  Willis Towers Watson based its conclusions on the Company's historical data projected against anticipated levels of asbestos-related claims "asserted in the U.S. tort system against all defendants."  The Company claimed that the reasonable estimate for these combined figures was $879.3 million, an increase of $770 million from the prior year.  BorgWarner then recorded a pretax asbestos-related net charge of $703.6 million for the 2016 fiscal year.  In particular, the 2016 Form 10-K stated:

> In the fourth quarter of 2016, the Company determined that its best estimate of the aggregate liability both for asbestos-related claims asserted but not yet resolved and potential asbestos-related claims not yet asserted, including an estimate for defense costs, is $879.3 million as of December 31, 2016. The Company recorded a charge of $703.6 million before tax ($440.6 million after tax) in Other Expense, representing the difference in the total liability from what was previously accrued, consulting fees, less available insurance coverage.

*     *     *

- 34 -

In developing the estimate of liability for potential future claims, the third-party consultant projected a potential number of future claims based on the Company's historical claim filings and patterns and compared that to anticipated levels of unique plaintiff asbestos-related claims asserted in the U.S. tort system against all defendants. The consultant also utilized assumptions based on the Company's historical proportion of claims resolved without payment, historical settlement costs for those claims that result in a payment, and historical defense costs. The liabilities were then estimated by multiplying the pending and projected future claim filings by projected payments rates and average settlement amounts and then adding an estimate for defense costs.

**The SEC Begins to Investigate the Company's Accounting for Asbestos-Related Liabilities**

64.     The SEC took notice of the Company's charge.  Shortly after the February 2017 disclosures, in May 2017, the SEC contacted BorgWarner concerning its accounting practices with respect to asbestos-related liabilities.  In its initial letter sent on May 11, 2017, the SEC noted the Company's recent disclosures and asked BorgWarner to "tell us your consideration of accounting for this as a correction of an error in previously issued financial statements rather than as a change in estimate."[7]  The SEC continued to seek clarification from the Company about its February 2017 disclosures throughout the rest of the year.

_____

[7] The Company recorded the $879.3 million as a change in estimate.  If the matter was not considered a change in estimate, it would be viewed as a correction of an error which would result in the restatement of prior year financial statements recording the change in the period in which it became reasonably estimable.

- 35 -

65.     Then, in a letter to the Company dated August 23, 2017, the SEC sought

further clarification as to "why [BorgWarner] did not retain a third-party consultant

prior to third quarter of 2016 to provide that specialized actuarial assistance in

connection with the estimation of your asbestos-related claims asserted but not yet

resolved and those not yet asserted."   The SEC also noted that, based on

BorgWarner's assertion that losses for claims not yet asserted were probable, the

Company should have recorded a liability prior to its February 2017 disclosures.  In

particular, the SEC's letter stated:

> We note your response to our prior comment 1 that you concluded a
> liability for potential claims not asserted was probable prior to the
> quarter ending December 31, 2016 but you did not attempt to estimate
> a liability because you concluded you could not develop a reasonable
> estimate.
>
> In your response to our prior comment 4 you state that you retained the
> third-party consultant to provide specialized actuarial assistance in
> connection with the estimation of your asbestos- related claims asserted
> but not yet resolved and those not yet asserted.  You state your inhouse
> personnel have experience with issues respecting asbestos-related
> claims, including, for example, in analyzing your asbestos claims
> information, identifying trends in your claims experience, and
> estimating the aggregate costs to be incurred on account of asbestos-
> related claims asserted but not yet resolved.  You determined, however,
> that you required additional actuarial expertise specific to the
> estimation and modeling of asbestos-related liabilities over significant
> future periods (i.e., approximately 50 years) in order to conduct an
> estimation of your asbestos-related claims not yet asserted. Such
> expertise included the ability to create a reliable model of the incidence
> of asbestos related disease in the U.S. population generally over the
> expected claiming period, and then to obtain the projected number of
> potential asbestos-related claims that may be asserted against you
> resulting from such model in order to create an aggregate estimate of

the value of potential asbestos-related claims that may be asserted against you in the future. ***It continues to be unclear why you did not retain a third-party consultant prior to third quarter of 2016 to provide that specialized actuarial assistance in connection with the estimation of your asbestos-related claims asserted but not yet resolved and those not yet asserted.***

Paragraph 450-20-25-5 states that accrual of a probable loss should not be delayed until only a single amount can be reasonably estimated. To the contrary, when a loss is probable and information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated. Thus, when a loss is probable and the reasonable estimate of the loss is a range, an amount should be accrued for the loss.

Paragraph 450-20-30-1 states if some amount within a range of loss appears to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range should be accrued. Therefore, your basis for limiting your ASC 450 assessment to asbestos-related claims asserted but not yet resolved continues to be unclear.

An ASC 450 assessment should consider all claims both asserted but not yet resolved and claims not yet asserted. ***Based on your assertion that losses for claims not yet asserted were probable (i.e., not zero), it appears that the conditions to record a liability would be met for at least a minimum amount within a range.***

66.    In the same letter, the SEC noted that the Company admitted to using historical data to provide its newly disclosed estimates.  The SEC sought further clarification as to why the Company now used historical data when it was previously considered unreliable.  In particular, the letter stated:

We note your disclosure that "In developing the estimate of liability for potential future claims, the third-party consultant projected a potential number of future claims based on the Company's historical claim filings

- 37 -

and patterns and compared that to anticipated levels of unique plaintiff asbestos-related claims asserted in the U.S. tort system against all defendants. The consultant also utilized assumptions based on the Company's historical proportion of claims resolved without payment, historical settlement costs for those claims that result in a payment, and historical defense costs. The liabilities were then estimated by multiplying the pending and projected future claim filings by projected payments rates and average settlement amounts and then adding an estimate for defense costs." Please explain to us why historical data was used when it was previously considered unreliable. Also clarify whether or not the historical data was updated as a result of the enhancements the Company made to its management and analysis of asbestos-related claims.

67. On October 26, 2017, BorgWarner filed its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC. In the Q3 2017 Form 10-Q, the Company repeated its claims in the 2016 Form 10-K that it could now, with the assistance of the third-party consultant, estimate its aggregate liability for asbestos-related claims. However, the Q3 2017 Form 10-Q failed to disclose BorgWarner's material weaknesses in internal controls given its omissions of asbestos-related liabilities estimates for the periods prior to December 31, 2016. As explained above, by this time, the SEC had informed the Company that "[i]t continues to be unclear why you did not retain a third-party consultant prior to third quarter of 2016," and that "the conditions to record a liability would be met for at least a minimum amount within a range" for those periods. In particular, the Q3 2017 Form 10-Q stated:

> The Company reviews, on an ongoing basis, its own experience in handling asbestos-related claims and trends affecting asbestos-related

claims in the U.S. tort system generally, for the purposes of assessing the value of pending asbestos-related claims and the number and value of those that may be asserted in the future, as well as potential recoveries from the Company's insurers with respect to such claims and defense costs. During the fourth quarter of 2016, the Company determined that a reasonable estimate of its liability for asbestos claims not yet asserted could be made, and the Company increased its aggregate estimated liability for asbestos-related claims asserted but not yet resolved and potential asbestos-related claims not yet asserted to $879.3 million as of December 31, 2016.

*     *     *

The Company's estimate of its aggregate liability for asbestos-related claims asserted but not yet resolved and potential asbestos-related claims not yet asserted was developed with the assistance of a third-party consultant. In developing such estimate, the third-party consultant projected a potential number of future claims based on the Company's historical claim filings and patterns and compared that to anticipated levels of unique plaintiff asbestos-related claims asserted in the U.S. tort system against all defendants. The consultant also utilized assumptions based on the Company's historical proportion of claims resolved without payment, historical settlement costs for those claims that result in a payment, and historical defense costs. The liabilities were then estimated by multiplying the pending and projected future claim filings by projected payments rates and average settlement amounts and then adding an estimate for defense costs.

68.    In a letter to the SEC dated January 25, 2018, non-defendant Hundzinski revealed that BorgWarner "projected that approximately 27,500 claims will be asserted in the future," but recorded only net 5,400 assumed future claims because it estimated the difference "will be resolved without payment." With respect to its recorded liability in the 2016 Form 10-K, "[t]he recorded liability relates to

approximately 9,400 claims asserted against the Company at December 31, 2016, which represents all claims including those claims asserted prior to 2005."

69.     On February 8, 2018, BorgWarner filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Cuneo, Hanley, and Michas each signed the 2017 Form 10-K.  In the 2017 Form 10-K, the Company repeated its claims in the 2016 Form 10-K that it could now develop "an estimate of the potential value of asbestos-related claims asserted but not yet resolved as well as the number and potential value of asbestos-related claims not yet asserted."   However, the 2017 Form 10-K maintained BorgWarner's assertion that its asbestos-related liabilities for unasserted claims could not be estimated for periods prior to the year-ending December 31, 2016, even despite the SEC's earlier assertion that "it appears that the conditions to record a liability would be met for at least a minimum amount within a range" for those periods.  In particular, the 2017 Form 10-K stated:

> The Company reviews, on an ongoing basis, its own experience in handling asbestos-related claims and trends affecting asbestos-related claims in the U.S. tort system generally, for the purposes of assessing the value of pending asbestos-related claims and the estimated number and value of those that may be asserted in the future, as well as potential recoveries from the Company's insurers with respect to such claims and defense costs.  For periods prior to the year ending December 31, 2016, the Company determined that its liability for pending asbestos-related claims not yet resolved, and their associated defense costs, was both probable and reasonably estimable and, in accordance with ASC 450-20, *Contingencies*, the Company accrued a liability for such claims. The Company further determined with respect to such periods that its

liability for potential asbestos-related claims that had not yet been asserted, and their associated defense costs, could not then be reasonably estimated. The inability to arrive at a reasonable estimate of the liability for such claims and defense costs was based on, among other factors, the Company's unique defense profile resulting from the fact that its long-discontinued asbestos-containing products used encapsulated asbestos, ceased to be manufactured more than 30 years ago, and had short useful lives; the volatility in claim filing patterns against the Company, including the number and type of such claims; changes in asbestos-related litigation in the United States and tort reform efforts at the individual court level and as a result of state or federal legislation; the significant number of co-defendants that had filed for bankruptcy; the magnitude and timing of co-defendant bankruptcy trust payments; and the inherent uncertainty of future disease incidence and claiming patterns against the Company. All of these factors collectively formed the basis for the Company's conclusion in periods prior to the year ending December 31, 2016 that a reasonable estimate of the liability for potential asbestos-related claims not yet asserted could not be made.

70. In April 2018, the SEC informed BorgWarner of its belief that the Company did not adequately support its conclusions related to its ability to make a reasonable estimate of IBNR asbestos-related liabilities. In particular, in a letter filed with the SEC in August 2018, the Company provided:

> In April 2018, following the exchange of several comment letters and responses and the Company's provision of supporting documentation to the Staff, the Staff communicated to the Company its position that the Company did not adequately support its conclusions in 2015 and prior periods related to its ability to make a reasonable estimate of IBNR asbestos-related liabilities. The Staff further advised that the Company should seek to obtain additional support for its accounting for IBNR asbestos-related claims in 2015 and prior periods. The Staff also requested that the Company consider how the additional procedures performed to support the accounting treatment in 2015 and prior periods reflect on the Company's controls. Specifically, the SEC

suggested that the Company work with an actuary for periods prior to 2016 to reconsider the previous ASC 450 conclusions.

71.     On April 26, 2018, BorgWarner filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q") with the SEC.  In the Q1 2018 Form 10-Q, the Company repeated its claims that it was now able to estimate its aggregate liability for asserted and unasserted asbestos-related claims with the assistance of a third-party consultant.  However, the Company yet again failed to address its material weaknesses in internal controls leading to the omissions, and how those material weaknesses led to omissions of asbestos-related liability estimates for the periods prior to year ended December 31, 2016.

## THE TRUTH BEGINS TO EMERGE

72.     The truth about the Individual Defendants' wrongdoing and the material weakness in BorgWarner's internal controls over financial reporting began emerging when BorgWarner filed its 2016 Form 10-K on February 9, 2017, in accordance with the above, it reported a change in estimate for the accounting of its asbestos-related IBNR liabilities and recording a pre-tax, non-cash charge of $703.6 million.

73.     Then, on June 15, 2018, when BorgWarner filed a Current Report on Form 8-K with the SEC announcing it had inaccurately reported the estimated value of IBNR asbestos-related claims.  As a result, the Company announced it would restate its consolidated financial statements for the 2015 and 2016 fiscal years, included in the 2017 Annual Report, and make revisions to selected financial data

for 2013, 2014, and its quarterly information for 2016. The Company also stated it would make additional changes to the valuations of its liability and corresponding available insurance. In particular, the Form 8-K stated:

> The Audit Committee of the Board of Directors (the "Audit Committee") of BorgWarner Inc. (the "Company") concluded on June 12, 2018, after careful consideration of the relevant facts and circumstances and following consultation with the Company's management and PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, that the Company's consolidated financial statements for the fiscal years ended December 31, 2016 and 2015 included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 should be restated, and that such consolidated financial statements should no longer be relied upon, due to the Company's re-evaluation of its accounting for liabilities relating to the estimated value of incurred but not reported asbestos-related claims ("IBNR Claims") and their associated defense costs. The Company will also make appropriate revisions to the selected financial data for 2014 and 2013 and the quarterly information for 2016 to reflect these changes. Background concerning the Audit Committee's conclusion is provided below.
>
> The principal effects of the restatement are:
>
> - The Company will retroactively determine, with the assistance of its outside actuarial consultant, an appropriate estimated liability for IBNR Claims to be accrued as of December 31, 2012 as an adjustment to retained earnings;
>
> - The estimated amount accrued as of December 31, 2012 will be included in the Company's consolidated financial statements for each fiscal year ended December 31, 2013, 2014, 2015, and 2016, adjusted for amounts actually spent by the Company during each of those years on account of asbestos-related claims and associated defense costs in addition to any changes in the valuation of the liability;

- The charge originally taken by the Company on account of asbestos-related claims in the fourth quarter of 2016 will be reversed, resulting in an increase in the Company's 2016 earnings, net of the adjustment for IBNR Claims in 2016; and

- The Company will make appropriate adjustments to the valuation of its insurance assets that are responsive to asbestos-related claims to account for the estimated value of those assets in earlier years.

74.    Non-defendant Hundzinski explained in a June 15, 2018 Asbestos Accounting Update Call with analysts and investors that the Company would retroactively determine the appropriate IBNR to be accrued as of December 31, 2012, as an adjustment to retained earnings.  Hundzinski further explained the accrued liability would then be restated, as adjustments, in the Company's consolidated financial statements for 2012 through 2016 and that the $703.6 million charge in 2016 would be reversed.  He attempted to downplay the Company's error by telling investors, "[a]t a high level, we are basically moving the 2016 asbestos charge back to 2012."   Specifically, Hundzinski stated:

> So, to summarize, we will determine estimated liabilities for IBNR Claims as of the year 2012. The accrued amounts will be included in financial statements for 2012, 2013, 2014, 2015, and 2016, like I said earlier. And finally, the 2016 reported earnings expected to increase due to the reversal of the charge taken in Q4 of 2016. So, at a high level, we are basically moving the 2016 asbestos charge back to 2012.

75.    In sum, by claiming the incurred liability could not be estimated, the Individual Defendants had hidden at least three years of asbestos-related liabilities from the public.  Further, by stating they would make changes to the liability and

insurance valuations, the Individual Defendants admitted that the 2016 charge was not an accurate valuation of its liability. These omissions and inaccuracies demonstrated a material weakness in the Company's internal controls.

76. Although the Company provided a series of reasons why it was finally able to estimate its IBNR liability—including hiring outside attorneys and staff to more efficiently resolve asbestos-related suits as well as hiring consultants to analyze claim data and better estimate the contingent liability—these reasons never explained why BorgWarner waited until the fourth quarter of 2016 to enact these measures. The Company was capable of enacting these measures as early as 2012, if not before. The SEC has also supported this position by informing BorgWarner of its failure to provide better guidance on its contingent liabilities. Last, BorgWarner itself determined these estimates should have been previously provided.

77. On this news, BorgWarner's market capitalization plummeted over the next week, falling $3.73 per share, on June 22, 2018, to close at $45.09 per share compared to a closing of $48.82 per share just six days before, erasing more than $783 million in market capitalization.

**The SEC Issues a Cease-and-Desist Order Against the Company**

78. On July 31, 2018, the SEC informed BorgWarner it was "conducting an investigation related to the Company's historical accounting for asbestos-related claims not yet asserted."

79.    On August 26, 2020, the SEC issued the SEC Order.  In its order, the SEC concluded that, from 2012 until the fourth quarter of 2016, BorgWarner failed to estimate its IBNR liability for future asbestos claims even though the Company noted that future claims were probable prior to 2016.  BorgWarner "came to this conclusion without conducting sufficient analysis, including any substantive quantitative inquiry, despite possessing nearly 40 years of historical raw claims data.  Rather, the Company's assessment was based on untested qualitative assumptions not relevant to calculating an estimate."  As a result, the Company's financial statements were materially misstated.

80.    This failure to record the IBNR estimate was due to a material weakness in the Company's internal controls over financial reporting.  Specifically, BorgWarner memorialized its conclusion that it could not reasonably estimate IBNR claims in internal "Memos" written and updated by a Company employee.  These Memos repeatedly stated that BorgWarner could not reasonably estimate its asbestos liabilities based on "high-level assumptions that were not subject to substantive quantitative analysis, actuarial assessment, or other testing."  Prior to 2014, "no one at the Company reviewed the Memos ... [and] [t]he process of creating and updating the Memos represented the Company's only internal control around whether it could estimate its asbestos-related IBNR."  Even when the Company first discussed hiring actuarial assistance in 2015, BorgWarner determined that an actuary was not

necessary.  As described herein, these failures demonstrate a material weakness in BorgWarner's internal controls over financial reporting, and a blatant disregard of the Company's lawful reporting requirements.  In particular, the SEC Order stated:

7. From at least 2011 until 2014, BorgWarner's conclusion that it could not reasonably estimate IBNR claims was memorialized in a two page memo-to-file (the "Memos") authored and updated by a Company employee.

8. The Memos consistently stated that BorgWarner could not reasonably estimate the amount of its IBNR asbestos liability due to a number of qualitative factors that created insurmountable uncertainty. Specifically, the Company concluded that there was no way to accurately estimate how many people had been exposed to BorgWarner products, the incidence of illness, or the life expectancies of exposed individuals. BorgWarner also concluded that because its asbestos-containing clutch pads were normally sealed inside a clutch housing, BorgWarner's position was unique among asbestos defendants, rendering industry benchmarks inapplicable for estimating BorgWarner's IBNR asbestos liability. These conclusions were based on high-level assumptions that were not subject to substantive quantitative analysis, actuarial assessment, or other testing.

9. In late 2014 and 2015, BorgWarner implemented a number of changes regarding its approach to asbestos litigation in an effort to reduce litigation costs. As part of that process, the Company hired a new employee who had asbestos litigation experience, as well as prior experience with evaluating IBNR asbestos liability. In the years leading up to 2014, no one at the Company reviewed the Memos memorializing the Company's analysis, which were updated on an annual basis. The process of creating and updating the Memos represented the Company's only internal control around whether it could estimate its asbestos-related IBNR.

10. Beginning in 2015, the Company discussed whether to retain an actuary to evaluate BorgWarner's data for IBNR purposes. Repeating the untested assumptions set forth in the Memos, BorgWarner determined that an actuary was not necessary, citing, among other

factors, gaps in its claims data, the uniqueness of the Company's product (which the company asserted rendered industry benchmarks inapplicable), and volatility in claims patterns.

11. Thereafter, BorgWarner began to populate missing data fields, evaluate claims patterns, and assess volatility using information from the Company's database, which included over 100,000 claims at the time and dated back to the 1980s; and also began evaluating other companies' public filings.

12. In conjunction with this work, in September 2016, the Company hired an actuarial firm with asbestos claims expertise (the "Actuary") to perform an actuarial analysis for the purpose of determining whether the Company's IBNR asbestos liability was reasonably estimable.

13. While BorgWarner had previously concluded that its data set was incomplete, the Actuary was generally able to obtain sufficient information from litigation files accessible to the Company. In addition, the Actuary determined that industry benchmarks could be applied to BorgWarner and that it did not need to adjust the benchmarks because BorgWarner's claims data was volatile or inherently unique – a finding in contrast to the Company's prior position that industry benchmarks were inapplicable. Moreover, the Actuary found that the multiple inhibiting factors listed in the Company's Memos (such as product uniqueness and unknown exposure rates) were not barriers to its estimation of future liabilities.

81.    Based on the foregoing, the SEC ordered BorgWarner to cease and desist from committing any future violations of the reporting provisions of the federal securities laws and pay a civil penalty of $950,000.

## **REASONS THE STATEMENTS WERE IMPROPER**

82.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse

facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   that the Company unlawfully omitted estimates of asbestos-related loss contingencies from its filings with the SEC;

(b)   that the Company was capable of making the purported "enhancements" that led to its ability to reasonably estimate unasserted asbestos liabilities prior to 2016;

(c)   that the Company failed to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures; and

(d)   as a result of the foregoing, the Individual Defendants' representations concerning the Company's financials were improper.

## THE INDIVIDUAL DEFENDANTS CAUSED BORGWARNER TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

83.   In breach of their fiduciary duties to BorgWarner, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, the Director Defendants caused or approved of the Company's repurchase of 2,224,503 shares of its stock at artificially inflated prices.

84.   As described above, near the end of August 2017, the SEC had informed the Company that "[i]t continues to be unclear why you did not retain a third-party consultant prior to third quarter of 2016[,]" and that "the conditions to record a liability would be met for at least a minimum amount within a range" for

those periods.  Thus, by at least September 1, 2017, the Company knew that it should have retained a third-party consultant and should have recorded its asbestos-related contingent liabilities prior to the 2016 Form 10-K.  This demonstrated the Individual Defendants' failure to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures.  Yet, even after the SEC's comment letter in August 2017, the Individual Defendants continued to issue financial statements that again failed to properly address BorgWarner's omissions of asbestos-related liability estimates for the periods prior to the 2016 Form 10-K, as well as its material weaknesses in internal controls leading to the omissions.  As a result, these statements continued to misrepresent the Company's true financial health and adequacy of internal controls.

85.     During this time, between January 1, 2018 and June 15, 2018, the Board approved repurchases of the Company's common stock at artificially inflated prices that substantially damaged BorgWarner.  In total, the Company spent an aggregate amount of over $113 million to repurchase 2,224,503 shares of its own common stock at artificially inflated prices from January 2018 to June 2018, as shown by the table below:

| Date of Board Authorization Repurchase Program | Authorized Amount of Repurchase | Period | Repurchased Shares | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost |
|---|---|---|---|---|---|---|
| February-15 | $1.0 Billion | | | | | |
| | | Jan-18 | 344,000 | $55.74 | $8.62 | $19,174,560 |
| | | Feb-18 | 290,336 | $52.63 | $6.87 | $15,280,384 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | Mar-18 | 461,607 | $49.82 | $10.34 | $22,997,261 |
|  |  | Apr-18 | 414,925 | $52.06 | $9.71 | $21,600,996 |
|  |  | May-18 | 419,614 | $50.38 | $9.50 | $21,140,153 |
|  |  | Jun-18 | 294,021 | $45.33 | $5.99 | $13,327,972 |
| **Total:** |  |  | **2,224,503** |  | **$51.03** | **$113,521,325** |

86.     Through the repurchases, the Director Defendants signaled to the market that they believed BorgWarner's shares were undervalued and that the repurchases were the best use of the Company's cash.  Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics. Collectively, these actions artificially inflated BorgWarner's share price with each repurchase and increased the price for each subsequent repurchase.

87.     When the truth about the Company's true asbestos liabilities was fully exposed, BorgWarner's stock price fell to approximately $45.09 per share.  As a result, the 2,224,503 shares the Company repurchased between September 2017 and June 2018 for over $113 million were only worth approximately $100 million of what the Company paid for them.  The repurchase of inflated stock cost the Company over $13 million.

## INSIDER TRADING

88.     While the prices for stock were artificially inflated, and while they were in possession of material nonpublic information, Selling Defendants Cuneo, Ericson, Fadool, Lissalde, and Michas dumped a total of 194,472 shares of BorgWarner stock

for total proceeds of approximately $8,305,530.  Particularly, each of the Selling

Defendants' trades during the relevant period are listed as follows:[8]

- defendant Cuneo sold 5,500 BorgWarner shares for approximately $228,010 in illicit proceeds;

- defendant Ericson sold 60,454 BorgWarner shares for approximately $2,321,870 in illicit proceeds;

- defendant Fadool sold 4,000 BorgWarner shares for approximately $191,140 in illicit proceeds;

- defendant Lissalde sold 36,720 BorgWarner shares for approximately $1,609,360 in illicit proceeds; and

- defendant Michas sold 87,798 BorgWarner shares for approximately $3,955,150 in illicit proceeds.

## **DAMAGES TO BORGWARNER**

89.    As a result of the Individual Defendants' improprieties, BorgWarner

disseminated improper, public statements concerning the Company's asbestos-

related claims.  These improper statements have devastated BorgWarner's credibility

as reflected by the Company's $783 million market capitalization loss.

---

[8] All share totals and monetary values listed are estimated amounts.

90. BorgWarner's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, BorgWarner's current and potential customers consider a company's ability to accurately value its accounting liabilities and disclose material information to the public, as required under the law. Businesses are less likely to award contracts to companies that engage in improper accounting schemes. BorgWarner's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

91. Further, as a direct and proximate result of the Individual Defendants' actions, BorgWarner has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from restating BorgWarner's financial statements;

(b) excessive sums paid to repurchase the Company's stock at inflated prices;

(c) costs incurred from defending and paying any settlement for violations of federal securities laws;

(d)    costs incurred in complying with the SEC investigation into the misconduct; including the $950,000 paid to the SEC following its finding that BorgWarner "erroneously relied on untested assumptions in concluding that it could not estimate its liabilities for these claims, including, for instance, that its products were unique among asbestos defendants and that industry benchmarks were inapplicable for purposes of calculating an estimate";

(e)    costs incurred to investigate wrongdoing in connection with the improper financial statements; and

(f)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to BorgWarner.

## DERIVATIVE AND DEMAND ALLEGATIONS

92.    Plaintiffs bring this action derivatively in the right and for the benefit of BorgWarner to redress injuries suffered, and to be suffered, by BorgWarner as a direct result of violations of securities law and breach of fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants.  BorgWarner is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.    Plaintiffs will adequately and fairly represent the interests of BorgWarner in enforcing and prosecuting its rights.

94.     Plaintiffs were stockholders of BorgWarner at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current BorgWarner stockholders.

95.     The current Board of BorgWarner consists of the following eight individuals: defendants Lissalde, Michas, and Hanley, and non-parties Sara Greenstein, David S. Haffner, Paul A. Mascarenas, Shaun E. McAlmont, and Deborah D. McWhinney.

96.     Plaintiff Don David Price made a demand on the Board, requesting that the Board investigate the alleged wrongdoing and take appropriate action (the "Litigation Demand"), including a comprehensive review and overhaul of the Company's corporate governance and compliance practices and systems of internal controls and reporting for the purpose of not only preventing a recurrence of the failures detailed in the Litigation Demand, but to optimize them considering current relevant best practices.

97.     The Board had an affirmative duty under Delaware law to conduct a reasonable, objective, and good faith investigation into the allegations in response to the Litigation Demand, and to determine on the basis of that investigation, *inter alia*, whether the Litigation Demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.

98.     Before completing its work relating to the Litigation Demand, counsel for the Company and counsel for the plaintiffs commenced negotiations regarding a potential settlement.   The parties ultimately reached agreement on the substantive terms of the proposed settlement, which were memorialized in a Memorandum of Understanding dated January 20, 2022.   Thereafter, the parties negotiated the terms of a formal Stipulation of Settlement, which was executed on May 19, 2022. Pursuant to the terms of the Stipulation of Settlement, plaintiffs intend to file a motion for preliminary approval of settlement within ten business days of the filing of this Complaint.

## COUNT I

### Against the Individual Defendants for Violation of
### Section 10(b) of the Exchange Act

99.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

100.   During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about BorgWarner, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.   Those false or misleading statements and the Individual Defendants' course of conduct artificially inflated the price of Company's common stock.

101.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to their false or misleading statements.   The Individual Defendants engaged in a scheme to defraud BorgWarner by causing the Company to repurchase $113 million in shares of its stock at artificially inflated prices.

102.   The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon BorgWarner in connection with the Company's purchases of its stock during the period of wrongdoing.

103.   The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of BorgWarner stock, which were intended to, and did: (a) deceive BorgWarner and its stockholders regarding, among other things, the Company's operations and financial prospects; (b) artificially inflate and maintain the market price of BorgWarner stock; and (c) cause BorgWarner to purchase its stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

104.   The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

105.   As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.   The misstatements and omissions of material facts set forth in this complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them. Throughout the period of wrongdoing, the Individual Defendants also had a duty to

disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

106. The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase of the Company's stock by the Company itself.

107. As a result of the Individual Defendants' misconduct, BorgWarner has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

108. BorgWarner would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

109. By reason of the Individual Defendants' wrongful conduct, they are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

110. Plaintiffs bring this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

111.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

112.   The Individual Defendants owed and owe BorgWarner fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe BorgWarner the highest obligation of loyalty and care.

113.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

114.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company omitted estimates of significant asbestos-related contingent liabilities from its filings with the SEC; and (ii) the Company failed to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

115.   The Director Defendants, as directors of the Company, owed BorgWarner the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper statements concerning BorgWarner's

business and financials and authorizing the repurchases of BorgWarner's stock at artificially inflated prices.  The Director Defendants knew or were reckless in not knowing that: (i) the Company omitted estimates of significant asbestos-related contingent liabilities from its filings with the SEC; and (ii) the Company failed to implement adequate internal controls designed to identify such liabilities and make the appropriate disclosures.  Accordingly, these defendants breached their duty of loyalty to the Company.

116.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

117.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BorgWarner has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

118.   Plaintiffs, on behalf of BorgWarner, have no adequate remedy at law.

## COUNT III

**Against the Selling Defendants for Breach of Fiduciary Duty and
Misappropriation of Information Under Brophy**

119.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

120.   When the Selling Defendants made the sales alleged of herein, the Selling Defendants were in possession of material, adverse, nonpublic information regarding the estimated costs of the Company's asbestos-related liability.

121.   After the Company disclosed that it had inaccurately reported the estimated value of IBNR asbestos-related claims to the investing public, the price of the Company's stock, as well as its market capitalization, plummeted.

122.   The inside information was proprietary, nonpublic information regarding the Company's IBNR claims was known to the Selling Defendants and was the type of information which the Selling Defendants, in accordance with the Insider Trading Policy of the Company were specifically barred from trading upon. The inside information was a proprietary asset belonging to BorgWarner which was usurped for the Selling Defendants' benefit.

123.   The Selling Defendants' use of this information was a breach of internal corporate policies and their fiduciary duty of loyalty.  These defendants' trades were motivated in whole or in part by their possession of material, nonpublic information.

124.   At the time of their stock sales, the Selling Defendants knew that the public disclosure of this information would adversely affect the market price of BorgWarner's stock.  Thus, the Selling Defendants took the opportunity to sell their shares before the public became aware that the Company had inaccurately reported IBNR asbestos claims.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of BorgWarner, demand judgment as follows:

**A.**   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law and breach of fiduciary duty;

**B.**   Directing BorgWarner to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BorgWarner and its stockholders from a repeat of the damaging events described herein;

**C.**   Awarding appropriate equitable and/or injunctive relief;

**D.**   Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

**E.**   Granting such other and further relief as the Court deems just and

proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Dated:  May 23, 2022

<u>/s/     David Fink     </u>
David H. Fink (P28235)
Nathan J. Fink (P75185)
**FINK BRESSACK**
38500 Woodward Ave, Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
Email:   dfink@finkbressack.com
             nfink@finkbressack.com

*Liaison Counsel for Plaintiffs*

- AND -

Melinda A. Nicholson
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Email: melinda.nicholson@ksfcounsel.com

*Attorney for Don David Price*

Ashley R. Rifkin
**ROBBINS LLP**
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Email: arifkin@robbinsllp.com

*Attorney for Maria Nyiradi and Peter Wahler*

DocuSign Envelope ID: 58C4A3CE-DE49-474C-A0EC-15F99C4A44B0

## **VERIFICATION**

I, Don David Price, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint.

Based upon discussions with and reliance upon my counsel, and as to those facts of which I have

personal knowledge, the complaint is true and correct to the best of my knowledge, information,

and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____
                    5/17/2022

_____
DocuSigned by:
*Don David Price*
1D18C464F1444DD

DON DAVID PRICE

DocuSign Envelope ID: 17C44AAE-2B5F-4F76-988F-D7C4D14DCD66

## VERIFICATION

I, Maria Nyiradi, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:____5/20/2022_____

DocuSigned by:

*Maria Nyiradi*

D32C68326822401

MARIA NYIRADI

## <u>VERIFICATION</u>

I, Peter Wahler, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint.

Based upon discussions with and reliance upon my counsel, and as to those facts of which I have

personal knowledge, the complaint is true and correct to the best of my knowledge, information,

and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 5/16/2022
_____

DocuSigned by:

_____
09DC81DAA0CE43E...

PETER WAHLER